## Pendergest  Estate

*Bryan R. Hermes*, for proponent.

*Herman H. Deal*, for appellant.

*Henry W. Maxmin* and *Marvyn Gould*, for legatees.

SHOYER, J., December 18, 1959.—This appeal from probate raises the issue as to whether decedent effectively revoked the "codicil" to her will.

Daisy Pendergest, a widow, and without issue, died July 21, 1957, at age 79. She left a will dated May 6, 1952, which had been prepared by her lawyer, James N. Lafferty, Esq., a highly respected member of the bar, whom she named executor, and to whom letters testamentary thereon were issued on July 24, 1957, by the Register of Wills of Philadelphia.

By her will she gave $2,000 to the West Laurel Hill Cemetery Company, in trust, and the further sum of $900 in trust for the perpetual care of the graves of her daughter and mother respectively. She directed that her stocks and bonds be sold and the proceeds divided equally between the Children's Heart Hospital of Philadelphia and the Philadelphia Society for Crippled Children; she gave the proceeds of the sale of her diamond rings ($544) to the Children's Heart Hospital, and gave the residue of her estate to Bertha Seydel, a friend.

Her inventoried estate amounted to approximately $50,000, of which about $13,000 was cash on hand and in banks, about $36,000 in securities, and the balance in jewelry and household effects.

The account of the executor, which was called for audit on April 16, 1958, showed a balance of principal of $43,995.33. Counsel requested that I construe a four-page holographic document dated May 16, 1955, which was signed at the bottom by decedent, and after which there had been written, "7/2/57—This is not a will, but simply directions to my executor" (and signed by decedent) "Daisy Pendergest." It was contended on behalf of the charities that this document,

hereinafter referred to as "C-1", was a codicil which increased the legacies to them, while the accountant and the residuary legatee contended that the instrument lacked animus testandi, and in any event had been effectively revoked.

The audit was thereupon continued in order that "C-1" might properly be brought to the attention of the register for his consideration, as a codicil.

Accordingly, on June 4, 1958, the Children's Heart Hospital appealed from the probate of the will, and pursuant to a stipulation of counsel, this court, on June 6, 1958, entered a decree opening the probate to enable the register of wills to consider and act upon a petition for probate of "C-1" as a codicil.

On June 10, 1958, the register of wills, after consideration of the petition for probate of "C-1" as a codicil, admitted the instrument to probate and issued supplemental letters testamentary thereon to the executor.

On June 11, 1958, a further hearing was held in connection with the audit of the executor's account. At that time, although no appeal from probate was then pending, the accountant and the residuary legatee attempted to attack the validity of the supplemental probate on the ground that "C-1" lacked testamentary intent and had been effectively revoked.

Over the objections of the charities, the accountant was called and testified that he was decedent's lawyer since 1945, that he prepared the will which was originally probated, that on July 1, 1957, he received a call from a friend of decedent who informed him that Mrs. Pendergest had been in the Misericordia Hospital for about a week and wanted him to come to see her, and that she thought he ought to bring her will along. He arranged to see Mrs. Pendergest the following day. He then testified: "I brought the will, which has already been probated, to the hospital, and

read it to her, and she restated to me *that is the way she wanted her will to be.* She then handed me several envelopes, one of which contained this writing . . . and I noted what seemed to be contradictions between the writing and the will, and I pointed that fact out to her, and she said *no, it was the will she wanted to stand;* that these were directions, as I regard them, largely of a personal nature. So after I had read through it and discussed this will with her, I wrote at the bottom of the last page . . . 'This is not a will, but simply directions to my executor,' and had her sign it. She also at that time gave me another envelope, which was to be delivered to a friend of hers upon her death, which I subsequently mailed to them by registered mail, and the keys to her apartment, and also, I believe, to her safe deposit box." (Italics supplied.)

Mr. Maxmin stated: "We have no cross examination."

In answer to questions by the court, Mr. Lafferty further testified that the paper dated May 16, 1955, which was in the envelope, had been completed and signed before he went into the hospital on that day (July 2, 1957).

Since the supplemental decree of probate unappealed from is conclusive, it was questionable whether the testimony was admissible at this time: Mangold v. Newman, 371 Pa. 496, 498.

The audit was therefore again continued to afford the parties a further opportunity to appeal from the register's supplemental decree of probate.

Bertha Seydel, the residuary legatee under the will, filed with the register her appeal from the probate, and on February 4, 1959, the record was certified to this court. Upon appellant's petition this court, on February 9, 1959, directed the issuance of a citation to all parties in interest to show cause why the sup-

plemental decree of the register admitting "C-1" to probate as a codicil should not be set aside. The petition alleged, inter alia, that the later writing was not intended as a codicil by decedent. The Children's Heart Hospital filed an answer joining issue.

All parties admit that the holographic writing consisting of four pages, numbered 1 to 4, was signed by decedent at the end of the 4th page, just preceding the date, May 16, 1955. Underneath that date there appears the postscript which was added by Mr. Lafferty, as referred to above.

The writing states which dress and beads decedent desired to be buried with, that the picture of her daughter and her late husband was to be buried with her, that the picture and frame of William Newman was to be destroyed, that a picture of Dr. Herbert Baldwin was to be returned to Mrs. Fred Butler, that a picture of herself was to be given to Edna Ullrick, if living, otherwise to be destroyed, her books of programs and cards to go to the Charlotte Cushman Club.

"Give Edna Ullrich all the clausinee if she is living . . . If Helen Zimmerman is living please let her select something . . . Give the dictionary and table to hold same, to William E. Rosenblum . . . If Helen McCool is living give her something to remember . . . If Bertha Seydel is living, give her all my dresses, hats, fur coats, underwear, my living room furniture, hook rugs, also bed-room furniture, if she is not living then give furniture to Penn Asylum . . . If Ann Anthony is in my employ she is *not* to get one thing; she has been very impudent, she has been fired . . . If there is anything that James N. Lafferty my attorney would like to have, please take it . . . My will is in Safety Deposit Box Number 3416 Land Title Bank. My stocks consist of the following—the certificates also in safety box 600 shares General Motors,

200 shares Empire Financial Co., 128 shares Phila. Electric 120 shares Wellington Fund . . . If there is any money in the banks, give to Crippled Children, and Heart Hospital . . . The Banks are, Tradesmens National Bank & Trust Co. now called Provident Tradesmens, Quaker City Federal Savings Fund—35 S. 16, Beneficial Saving Fund—1200 Chestnut St. Phila. Saving Fund—1212 Market St . . . Give Wm. O. Newmann the small Zenith radio, he gave it to me . . . My 2 Diamond rings to be sold but *not* to William O. Newman. He has a very nice Masonic Diamonnd ring which *I* gave him when he became a 32nd degree Mason Feb. 29, 1924 . . . Let Edna Ullrich have the first chance at buying my diamond rings . . . My bedroom and living room furniture give to Bertha Seydel is she is living. Bertha offered me a home any time I needed one also Edna Ullrich offered me a home."

/s/ "Daisy Pendergest"

"Date May 16, 1955

"7-2-57

"This is not a will but simply directions to my executor."

/s/ "Daisy Pendergest."

In Rockett Will, 348 Pa. 445, 448, the Supreme Court held:

"In this Commonwealth the line of demarcation between matters of probate and of distribution or construction is distinct and definite. In this connection it was said by this Court, in Carson's Estate, 241 Pa. 117, 121, 88 A. 311: 'The probate of a will without regard to its provisions is one thing; distribution of the estate of the testator in accordance with its terms is another. The former is for the register; the latter is none of his concern.'"

In Kauffman Will, 365 Pa. 555, 557, the Supreme Court restated the universally adopted definitions of a will:

"A will was defined by Blackstone (2 Bl. Comm. 499) as 'the legal declaration of a man's intentions, which he wills to be performed after his death,' and by Kent as 'a disposition of real and personal property to take effect after the death of the testator.' "

In Thompson Will, 375 Pa. 193, the question was whether the letter which decedent wrote to his niece was testamentary. Parol extrinsic testimony was admitted without objection and the court was required to consider its effect upon the question whether or not the probated paper constituted the will.

Mr. Justice Stearne, for a unanimous court, stated at page 197:

"Where a writing by its terms clearly constitutes a testamentary disposition, evidence of a contrary intent is inadmissible: Lillibridge's Estate, 221 Pa. 5, 69 A. 1121; Gibson Estate, 128 Pa. Superior Ct. 44, 193 A. 302. Conversely, where a writing is obviously *not* a will, evidence of testamentary intent is not admissible: McCune's Estate, 265 Pa. 523, 109 A. 156; O'Connor's Estate, 273 Pa. 391, 117 A. 61. Where, however, such intent is doubtful or equivocal, extrinsic evidence is admissible: O'Connor's Estate, supra; Smith's Estate, 308 Pa. 265, 162 A. 214; McKean Estate, 159 Pa. Superior Ct. 409, 48 A. 2d. 74."

In the instant matter the questioned paper is undoubtedly equivocal.

Standing alone and prior to the postscript, the four-page holographic writing dated May 16, 1955, signed at the end thereof, makes further provision for decedent's burial and gives additional specific bequests to Crippled Children, Heart Hospital and others, and to that extent thereby revokes the gift contained in her will of her residuary estate to Bertha Seydel, appellant. On its face the 1955 paper appears to qualify for probate. On the other hand, the addendum to the

writing which her lawyer added at her direction in the hospital on July 2, 1957, that "This is not a will but simply directions to my executor," after which she affixed her signature, is equivocal.

It has been uniformly held that words of recommendation, request, wish or expectation addressed to the executor and used with respect to the direct disposition of testator's property are prima facie testamentary and imperative rather than precatory in effect, on the ground that testator, having a right to make such a disposition of his property as he thinks proper, the expression of his wish is deemed to be the expression of his *will* and the request is equivalent to a command: 49 A. L. R. 31; Hand's Estate, 315 Pa. 238; Filbert's Estate, 57 D. & C. 646.

It thus becomes quite evident that the addendum or postscript is couched in inconsistent and contradictory language, is equivocal and the circumstances surrounding testatrix at the time of its execution become relevant and material.

It may very well be that Mr. Lafferty's testimony as to the circumstances surrounding the execution by testatrix of the addendum clause was at that time inadmissible since there was then no appeal from probate of the original will.

However, Mr. Lafferty has since died. He gave his testimony in connection with the distribution of this estate which involved these very same parties; his testimony was given under oath and the proponents of the instrument, themselves there represented by counsel, expressly waived their right to cross-examination of him. His former testimony is therefore admissible as an exception to the hearsay rule both at common law and as provided for in our Evidence Act of May 23, 1887, P. L. 158, 28 PS §327; Brown on Penna. Evidence (1949), p. 192: Nestor v. George, 354 Pa. 19; Nixon Estate, 104 Pa. Superior Ct. 506. Further-

more, the testimony of Mr. Lafferty is also available as a declaration against his interest. The 1955 writing permits Mr. Lafferty to take "anything he would like to have . . ."

His uncontradicted testimony was to the effect that when he visited decedent at the hospital on July 2, 1957, he brought with him her will (more than likely a copy, since the writing of May 16, 1955, states that her will is in safe deposit box at the Land Title), and he noted what seemed to be contradictions between the writing and the will and pointed these out to her, and she replied: "no, it was the will she wanted to stand." Her exclamatory "no" could have referred only to that portion of "C-1" which made the additional bequest of money in the banks to the Crippled Children and Heart Hospital. The other matters related in "C-1" were largely of a personal, sentimental nature, and of insignificant monetary value, which were intended merely, or, as the scrivener phrased it, "simply as directions to my executors"; in all other respects it was not her will, and she renounced it as such. As a written instrument it had no legal effect, the minor sentimental gifts therein being binding only on her executor's conscience.

Section 5(2) of the Wills Act of April 24, 1947, P. L. 89, 20 PS §180.5, insofar as is here pertinent, provides:

"No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than: . . .

"(2) Other Writing. By some other writing declaring the same, executed and proved in the manner required of wills."

The statutory requirements for revocation by "some other writing" as set forth in section 5(2) and as pointed out by President Judge Taxis in Taubel Will, 9 Fiduc. Rep. 376, 380, are that the instrument (1) be in writing; (2) state its purpose to revoke, and

be signed with animus revocandi; (3) identify the instrument to be revoked; (4) be signed at the end thereof; and (5) the signature must be proved by the oaths or affirmations of two competent witnesses. See Gray Will, 365 Pa. 411, 416.

All of the elements required by the statute are here present and I therefore find that the codicil dated May 16, 1955, was effectively revoked by some other writing, namely, the addendum dated July 2, 1957, which was added to the bottom of "C-1" and signed by testatrix with animus revocandi, in conformity with the requirements of section 5(2) of the Wills Act of 1947, and the record is remitted to the register of wills with direction to refuse the probate of this document.